**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2860-24

DANIEL THOMPSON and
ELIZABETH THOMPSON,

     Plaintiffs-Respondents,

v.

GERALDINE JONES and RHYS
JONES,

     Defendants-Appellants.

_____

Argued June 1, 2026 – Decided July 17, 2026

Before Judges Sabatino, Natali and Bergman.

On appeal from the Superior Court of New Jersey, Chancery Division, Cumberland County, Docket No. C-000021-21.

Gerald B. Sweeney argued the cause for appellants (Sweeney Lev, LLC, attorneys; Gerald B. Sweeney, on the briefs).

Terance J. Bennett argued the cause for respondents.

PER CURIAM

    This appeal arises from a protracted dispute over a shared boundary line

between the properties of plaintiffs Daniel and Elizabeth Thompson, owners of

189 High Street, and defendants Geraldine and Rhys Jones, owners of 187 High Street, in Leesburg.   Following our prior remand requiring a new trial to permit expert testimony that was previously barred, the Chancery Division, after a multiple day bench trial, entered judgment in favor of plaintiffs, determining the boundary line between the parties' properties be set at a location as requested by plaintiffs and, alternatively, that plaintiffs acquired the disputed land by way of adverse possession.

Defendants appeal, challenging the trial court's failure to consider the language in the deeds before its consideration of extrinsic evidence, its evidentiary rulings regarding surveys and expert testimony, and its determination to award the disputed land to plaintiffs by way of adverse possession.   Having considered the arguments in light of the record and applicable legal principles, we affirm in part, reverse in part and remand to the trial court to make findings concerning the testimony of defendant's expert and to clarify or supplement its findings of fact and conclusions of law regarding its determination granting plaintiffs the disputed land by way of adverse possession.

A-2860-24

## I.

We recite the factual and procedural history from the portions of the record we deem to be relevant to this appeal.

First Appeal

On September 2, 2021, plaintiffs filed a complaint and order to show cause, seeking to establish the boundary line between their property at 189 High Street ("Lot 1") and defendants' adjacent property at 187 High Street ("Lot 2"). Plaintiffs attached a January 1999 survey to their complaint prepared by William Reale, which they obtained shortly prior to purchasing their property in 1999, and a May 2021 survey prepared by Guy DeFabrites of Fralinger Engineering that set forth the same boundary line between the lots as depicted on the Reale survey.

Immediately prior to beginning the first day of trial, defendants requested an adjournment to obtain an expert to testify or, alternatively, to produce an expert later at trial. Thompson v. Jones, No. A-3655 (App. Div. Nov. 9, 2023) (slip op. at 4). The trial court denied the motion, finding defendants did not have an expert ready to testify on the first day of trial, nor was one identified in their trial memo or listed as an expert on their witness list. Ibid. Defendants appealed. Id. at 2.

We vacated the order and remanded for a new trial.  Id. at 13-14.  We concluded the trial court "should have granted a short adjournment to allow defendants to have their expert testify at trial."  Id. at 10.  Acknowledging the court was "rightfully concerned with judicial economy," given fact witnesses were already present to testify when defendants requested the adjournment, we determined the trial court could have allowed defendants to produce their expert to testify at a later date, particularly given the trial did not conclude that date but continued a week later.  Id. at 10-11.  We further noted the trial court's recognition that it would benefit from expert testimony as set forth in its order denying defendants' motion for summary judgment, rather than relying solely on survey documents.  Id. at 11.

We further determined there was no unfair surprise to plaintiffs if defendants' called their expert, Joseph Feldman, to testify given the parties already intended to rely on his survey at trial and that his testimony "could have been accomplished in short order along with providing [plaintiffs] the same opportunity to call their expert to testify."  Ibid.  Accordingly, we concluded the trial court, despite its best intentions, misapplied its discretion in not adjourning the trial.  Id. at 11-12.

Concerning defendant's contention in the first appeal surrounding certain emails not produced during trial from another expert, DeFabrites, which purportedly acknowledged Feldman's survey was correct and his initial survey should not have been distributed, we declined to take a "position on the relevance or admissibility of [DeFabrites'] revised survey," id. at 12-13, but we determined "at the very least it could have possibly been utilized to impeach DeFabrites if he had testified." Ibid. We concurred with the trial court that defendants' proffered emails were not newly discovered evidence but nevertheless concluded the parties could explore the issue on remand to the extent plaintiffs still intended to rely on DeFabrites. Id. at 12, n.6.

We further determined there "appear[ed] to be serious concerns with both experts whose surveys were submitted at trial and relied upon by the court," based on defendants trial counsel's statement that "th[e] Feldman survey that was provided to me as truthful had a probability of not being truthful as presented to the [c]ourt through my license" as set forth in his second motion to withdraw as counsel for defendants. Id. at 12.

Remand Trial

After remand, the court conducted the second trial over three nonconsecutive days in September and December 2024. The following facts are derived from the remand trial record.

After contracting to purchase Lot 1 in 1999, plaintiffs commissioned Reale Associates to perform a survey of the property. Approximately twenty years later, defendants purchased the adjoining property, Lot 2, from a tax foreclosure sale and began renovating it in 2021. At one point during defendants' renovations, plaintiff Daniel Thompson ("Daniel"[1]) approached an individual on a ladder, who was performing work on defendants' house, to inquire whether the worker had insurance, asserting the base of the worker's ladder was on plaintiffs' property. This incident marked the beginning of the dispute between the parties.

Plaintiffs subsequently obtained an updated survey performed by Fralinger Engineering. Daniel requested Fralinger employees place markers on the side of the property shared with defendants to guide where plaintiffs would build their fence because of the ongoing dispute.

_____

[1] We reference the plaintiffs and defendants by their first names as they both share separate common surnames. We intend no disrespect.

A-2860-24

At trial, Rhys Jones, Geraldine's son, testified he observed plaintiffs advising Fralinger to place those markers closer to defendants' property. Geraldine testified that the Fralinger survey, prepared by survey Guy DeFabrites, was supposed to be a joint survey prepared for both parties but admitted her payment had been returned after she confronted Fralinger about plaintiffs attempting to change the survey's outcome by directing the placement of the markers. Daniel denied instructing Fralinger employees to move any markers. Elizabeth testified that defendants dug up the front corner survey marker between the parties' properties, which had been placed for the Reale survey.

In addition, plaintiffs produced three lay witnesses: Dorthy Dayton, Jody Carrara, and Gregory Bruckler. Dayton testified that she has lived in Leesburg since 1959 and is familiar with plaintiffs' property. She recalled Helen Butawitz had lived on the property prior to plaintiffs, including during the 1970s, when a sub shop was operated out of the property. Dayton recounted that Butawitz would park her car in the driveway at issue. Dayton further recounted tire ruts ran from the entrance on High Street through to the back of the property and a row of bushes used to be where plaintiffs fence is now.

A-2860-24

Carrara, who lives down the street from both parties, also recalled Butawitz parking her car in the driveway and the line of bushes on the property. Bruckler has lived in Leesburg since 1988 and previously from 1956 to 1976 and explained he helped plaintiffs build their privacy fence by following the locations of the survey makers. He recalled hitting a prior survey marker while digging holes for posts in the back of plaintiffs' property.

Additional evidence was also presented to the trial court, consisting of: (1) the Tax Map of the Township of Maurice River, prepared by Gordon Ludwig in 1991, as revised by Harold Noon in September 1994 (and various other revisions over time); (2) the survey performed by Reale Associates for the Thompsons on January 14, 1999 at the time they purchased Lot 1; (3) the survey performed by Fralinger Engineering, unsigned but dated May 20, 2021; (4) the survey performed by Fralinger Engineering with overlay of boundary lines from Feldman and Reale surveys dated May 20, 2021; (5) the survey performed by Feldman & Associates dated August 19, 2021; and lastly (6) the survey performed on May 10, 2022 by Ewing Associates. The parties also produced copies of the deeds for their properties including an 1876 Josiah deed, a 1997 Whildon deed, and the 1999 Thompson deed (utilizing a metes and bounds survey prepared by Reale Associates) for Lot 1 and an 1876 Robert deed, 2009

Stiles deed, and the 2021 Jones deed for Lot 2, which the trial court admitted into evidence. Aerial photographs of both parties' properties dating back to the 1940s were also admitted into evidence.

Defendants also produced the emails at issue in the first appeal from DeFabrites, but the trial court did not allow defendants to testify as to the substance of the emails, finding it to be impermissible hearsay.

Both parties also presented expert testimony. Harold Noon, Jr., a licensed professional land surveyor and mapper, testified for plaintiffs. Noon reviewed the surveys presented to the trial court but did not perform any field work or perform a survey of the parties' properties. He testified that the Reale, Ewing, and Fralinger surveys were all "generally" in agreement regarding the disputed boundary line but identified a discrepancy in Feldman's survey compared to the other three that matched Fralinger's second survey with the overlay.

Noon testified he observed the township conveyed title to defendants through a quitclaim deed referencing the tax map without a guarantee as to ownership or title. Therefore, he opined defendants' ownership interest could not be greater than conveyed in their deed, which was the lot and block defined on the tax map.

A-2860-24

Noon also testified that physical evidence, such as fences and hedge rows, are particularly important in a "metes and bounds state" particularly when, as in this case, "errant deeds" fail to achieve mathematical closure or contain ambiguities. For example, Noon specified that the 2009 Stiles deed to defendant's property contained "at least three or four different ambiguities" and "doesn't close by three feet." He opined, however, that the deed was not in defendants' chain of title given their quitclaim deed and defendants could not "own what [they] didn't take title to." Accordingly, regarding the discrepancy in Feldman's survey and Fralinger's second survey, Noon attested that he "couldn't figure out . . . how [they] got back to the Stiles deed on Lot 2" but noted the Ewing survey seemed to agree with him on the issue.

Feldman, a licensed land surveyor, testified for defendants. He conducted a survey of defendants' property, which revealed several identification points including rebar, iron pipes, a P.K. nail, and a concrete monument. Feldman testified his investigation revealed that Reale's marker points were incorrect. He calculated the discrepancy to be approximately 5.88 feet to the benefit of defendants' lot. Feldman explained, in shifting the property line 5.88 feet, plaintiffs' property would still have "the 98 and 48 feet" required by their original deed and Reale's survey but opined that the property line "should be

10

moved [approximately] six feet closer to Olive Street." Feldman also testified that he did not rely on the tax map because it is "completely irrelevant as far as surveying is concerned" and is utilized "for taxation purposes only." He further explained he relied on the metes and bounds description in the 2009 Stiles deed in performing his survey.

Feldman further confirmed his survey stated it was "prepared based on a description provided by [defendants] and all adjoining deed descriptions" and that "[a] description and a more detailed survey w[ould] be prepared after the property line discrepancy [wa]s resolved." Similarly, Noon's report also stated that "the appropriate resolution should come from the [c]ourt."

Defendants had subpoenaed DeFabrites to testify at trial, but upon taking the stand, plaintiffs requested the court advise DeFabrites of his Fifth Amendment rights. The court denied the request, noting it had no obligation to warn a potential witness who is not represented by counsel that their testimony may be self-incriminating. Nevertheless, DeFabrites invoked his Fifth Amendment right and refused to answer questions.

The Trial Court's Decision

On March 7, 2025, the trial court issued an order: (1) granting plaintiffs full rights and ownership over the land in dispute; (2) ordering the property line

separating the lots to be set as depicted in the 1999 survey by Reale Associates; and (3) ordering the fence, as erected by plaintiffs and approved by the Township Land Use Board, not be disturbed.

Accompanying its order was a written decision outlining the court's credibility determinations and findings. The decision found plaintiffs to be credible, noting their testimony was "truthful and candid." The court also deemed plaintiffs' three witnesses to be credible and their testimony to be "largely supported by other substantial evidence before [it], including the aerial view photos."

In contrast, the trial court did not find defendants' testimony to be credible. The court explained Geraldine's behavior in the courtroom was "troublesome," "disruptive," "overly aggressive," and "resulted in the [c]ourt's admonishment on several occasions," noting she called the court "corrupt" and "would not follow appropriate courtroom decorum principles." It found her "efforts to portray [plaintiffs] as the aggressors" to be "incredulous" and, instead, "quite the opposite to be true." The court also found Rhys' testimony "not believable when viewed in the totality of the evidence presented," noting he "was likewise admonished" for failing to answer questions directly. The court further found that plaintiffs had not attempted to influence the Fralinger survey by advising

its team where to place markers. The court noted defendants were alleged to have attempted to remove the markers placed by Reale Associates.

Addressing DeFabrites' refusal to testify, the trial court found Geraldine had "done everything in her power to thwart the search for th[e] truth" at trial. It explained:

> [Geraldine] clearly and admittedly filed a complaint against . . . DeFabrites [with the Better Business Bureau] in what appears to be an effort to discredit his opinion and to destroy his reputation. She clearly did not like the opinion of Ewing[,] . . . as he returned her money with the excuse that he did not want to testify. She engaged in conduct that was egregious enough for her attorney to request to be relieved of representation on the eve of trial. She made disparaging comments about her first trial attorney, her appellate attorney and the [c]ourt. She was caught on video damaging a surveillance camera of [plaintiffs]. The police have been called to the premises by [plaintiffs] on a number of occasions. Her behavior in the [c]ourtroom matches her behavior at the property in question. Her apparent efforts to intimidate the witnesses and change the narrative make it difficult for the [c]ourt to accept her arguments.

The trial court had "significant concerns" over how the litigants had treated DeFabrites. The court found it was "clear . . . there were efforts to silence . . . DeFabrites[,] who held an opinion that the original Reale survey was accurate." The court also found that DeFabrites advised Geraldine after this dispute arose, that his first unsigned survey was "rock solid" but later "back-

13

pedal[ed]" from his original opinion in his unsigned second survey in subsequent emails with Geraldine. It reasoned DeFabrites "was clearly being harassed" by Geraldine, who had also filed a complaint against him with the Better Business Bureau, pointed out Ewing had also returned Geraldine's payment "and advised her that he did not want to get involved and did not want to testify."

The court also addressed plaintiffs' request for a Fifth Amendment instruction, finding it to be "unnecessary" and unclear as to why they requested it, contributed to silencing his opinion. Against that backdrop, the court found "it impossible to place any weight" in Feldman's opinion or supported that the property markers he found were accurate and "not misplaced." Ultimately, the court found "[Feldman's] testimony or opinion [not] to be credible."

Regarding plaintiffs' expert, Noon, the court highlighted his testimony regarding his reliance on the Reale, DeFabrites/Fralinger, and Ewing surveys and that the tax map property line was at the same location as those surveys. It explained while Noon "candidly did admit that deeds provide for a metes and bounds description and [] advise surveyors, he also provided an opinion that one cannot ignore extrinsic evidence such as the existence of fences." The court noted, however, "neither expert provided a definitive opinion [regarding where

the boundary line was located] but rather[] withheld their final opinions pending a decision from th[e] [c]ourt."

The court also found, by clear and convincing evidence, that the property line was as described in the Reale and Fralinger surveys as well as depicted in the Township's Tax Map. The court specifically found:

> In the case at bar, the [c]ourt cannot disregard the substantial extrinsic evidence that has been presented. The [c]ourt finds that the disputed area was clearly used as a driveway dating back to the 1940's, as shown in the aerial view maps which were submitted. Furthermore, the garage, which was clearly in existence well before the Thompson's purchase of the property, has doors which face High Street and is almost in a direct line from the street through the disputed portion of the property. If the entrance to the Thompson property is from Olive Street, as Jones contends, the orientation of the garage would have been different. There is also clear evidence before the [c]ourt that the area in question was used as a driveway dating back to the 1970's when there as a sub shop in the front of the house and Ms. Butawitz parked her vehicle there. There is ample evidence of a fence on the back line of the property which predates the Thompsons, and there is also evidence that the fence constructed by the Thompsons as a result of this dispute is on the same line where there existed a row of bushes separating the two properties. If the property line were as Jones proffers, there would be insufficient space to use the disputed area as a driveway by the Thompsons. In fact, there is not a scintilla of evidence before the [c]ourt that Jones or any of their predecessors in interest claimed the disputed property, cared for the disputed property or parked their vehicles in that area. To the contrary, the

15

driveway for the Jones property is located on the opposite side of their home.

The [c]ourt therefore finds that there is clear and convincing evidence which is sufficient to establish that the property line is as described in the Reale, Fralinger and [t]ax map surveys as presented to the [c]ourt.

The trial court also alternatively found, even if the property line were to be as set forth in the Feldman survey, that plaintiffs had acquired title to the area at issue through adverse possession. The court determined plaintiffs' possession had been exclusive, continuous, uninterrupted, and visible and notorious, despite being under mistaken claim of title. The court concluded, although plaintiffs had resided in their home just short of the requisite thirty years necessary to gain title through adverse possession pursuant to N.J.S.A. 2A:14-30, it reasoned when tacking the plaintiffs' period of possession with their predecessor in interest's possession, it was sufficient to meet the requisite thirty years to establish adverse possession.

Defendants moved for reconsideration and clarification. Following oral argument, the trial court denied the motion and issued a written decision. It reasoned defendant's arguments were dependent on its credibility findings rather than legal errors, noting defendants presented no new information or case law to counter those findings. This appeal followed.

16

On appeal, defendants raise the following points for our consideration: (1) the trial court erred by failing to interpret or erroneously interpreting the deeds to specify the boundary line; (2) the court improperly admitted and relied upon surveys prepared by non-testifying experts, which defendants' assert were hearsay and net opinions; (3) the court improperly permitted and relied upon plaintiffs expert's testimony and improperly disregarded their expert's testimony without a valid basis; (4) the trial court's adverse possession finding was unsupported and was error; and (5) the equities favor defendants.

## II.

We begin by setting forth the principles that guide our analysis. In conducting our review, we apply a deferential standard to a "trial court's determinations, premised on the testimony of witnesses and written evidence at a bench trial." D'Agostino v. Maldonado, 216 N.J. 168, 182 (2013). "Findings by the trial judge are considered binding on appeal when supported by adequate, substantial and credible evidence." Rova Farms Resort, Inc. v. Invs. Ins. Co., 65 N.J. 474, 484 (1974). Therefore, "our appellate function is a limited one: we do not disturb the factual findings . . . of the trial judge unless we are convinced that they are so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice."

Ibid. (quoting Fagliarone v. Twp. of N. Bergen, 78 N.J. Super. 154, 155 (App. Div. 1963)). Additionally, particular deference is owed to the trial court's assessment of witness credibility because the court was able to observe the witnesses as they testified. Balducci v. Cige, 240 N.J. 574, 594-95 (2020); Seidman v. Clifton Sav. Bank, S.L.A., 205 N.J. 150, 169 (2011).

"The admission or exclusion of expert testimony is committed to the sound discretion of the trial court." Townsend v. Pierre, 221 N.J. 36, 52 (2015). "[W]e apply [a] deferential approach to a trial court's decision to admit expert testimony, reviewing it against an abuse of discretion standard." Id. at 53 (second alteration in original) (quoting Pomerantz Paper Corp. v. New Cmty. Corp., 207 N.J. 344, 371 (2011)).

A trial court's evidentiary determinations are also entitled to "substantial deference." State v. Cole, 229 N.J. 430, 449 (2017). "In reviewing a trial court's evidential ruling, an appellate court is limited to examining the decision for abuse of discretion." Hisenaj v. Kuehner, 194 N.J. 6, 12 (2008). "Evidentiary decisions are reviewed under the abuse of discretion standard because, from its genesis, the decision to admit or exclude evidence is one firmly entrusted to the trial court's discretion." Est. of Hanges v. Metro. Prop. & Cas. Ins. Co., 202 N.J.

369, 383-84 (2010) (citing Green v. N.J. Mfrs. Ins. Co., 160 N.J. 480, 492 (1999)).

However, "[a] trial court's interpretation of the law and the legal consequences that flow from established facts are not entitled to any special deference." Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995).

## A.

Initially, we address defendants' contention that the trial court erred by failing to interpret, or by erroneously interpreting, the relevant deeds to determine the boundary line between the two properties before turning to "extrinsic evidence." They argue that the historic deeds in this case clearly and unambiguously specify the boundary line using established measurements and reference points. Defendants assert that the trial court did not analyze or rely on these deed descriptions but instead based its decision on unreliable surveys and extrinsic evidence, which was improper because the deeds themselves were not ambiguous and should have controlled the outcome of the boundary dispute. We disagree.

The issue of construction of a deed "is a pure question of law to be decided by the court upon the terms of the instrument itself." Hofer v. Carino, 4 N.J.

19

244, 250 (1950). "But where there is a latent ambiguity" and "[w]henever the location of the premises is doubtful, through uncertainty, inconsistent or conflicting terms of the description in the deed[s], the proper location of the premises becomes a question of fact to be determined" by the fact finder. Ibid. Additionally, "where the deed description does not close[2], it is proper to resort to extrinsic evidence, which results in the issue becoming one of fact for" the fact finder. Ibid.

Here, we find no reasons to disturb the trial court's factual findings and legal conclusions related to this point. The record amply supports that the historic deeds contained inconsistent legal descriptions showing latent ambiguities. The evidence at trial disclosed "errant deeds," such as the 2009 Stiles deed, which failed to achieve mathematical closure of defendant's property. Noon testified the Stiles deed contained "at least three or four different ambiguities" and "doesn't close by three feet" as compared to the other metes and bounds descriptions presented at trial for Lot 2. This fact, coupled with the

---

[2] [Failure to close, when referencing a legal description or survey, also referred to a "misclosure," is the failure of the metes and bounds in a survey or legal description to return mathematically to its Point of Beginning. It represents the straight-line distance between the true starting coordinates and the calculated terminal point of the final boundary call. Robillard, W.G., Wilson, D.A., and Brown, C.M., Brown's Boundary Control and Legal Principles, § 12.04 (7th ed. 2014).]

A-2860-24

evidence of the legal descriptions of Lot 1 produced at trial that included the disputed area, was sufficient to show ambiguities existed. This evidence supports the court's consideration of extrinsic evidence, which we conclude was an appropriate and reasonable exercise of discretion as there was sufficient, credible evidence to support that an ambiguity existed.

Thereafter, plaintiffs' produced considerable and sufficient evidence, as outlined in the court's findings, including three witnesses who were familiar with the property and lived in the community for decades, aerial photographs dating back to the 1940s, expert testimony, and multiple surveys and deeds that all depicted the boundary line in the location proffered by plaintiffs. Therefore, we find no error in the court determining ambiguities in the deeds existed and its consideration of extrinsic evidence.

B.

Defendants next contend the trial court erred by relying upon surveys prepared by non-testifying experts—specifically the Reale, Fralinger/DeFabrites, and Ewing surveys—as well as the tax map, as extrinsic evidence to determine the property boundary. Defendants argue these surveys were inadmissible hearsay and constituted unreliable net opinions because they were not authenticated, explained, or validated by the surveyors who prepared

21

them or by any testifying expert, and a proper foundation was not shown to consider this evidence relied upon by Noon.

Defendants further assert the DeFabrites/Fralinger survey was expressly withdrawn by its preparer as inaccurate, and that the tax map did not accurately define the boundaries of the lots. Defendants maintain the only valid and admissible survey was the one prepared by their expert, Feldman, which was supported by competent testimony and properly authenticated, but was erroneously disregarded by the court.

Although we have partially addressed the trial court's consideration of extrinsic evidence in the previous section, which we incorporate herein, we squarely address the court's consideration of Noon's testimony challenged by defendants who assert Noon offered a net opinion based on his reliance on the surveys and other documents.

Under N.J.R.E. 703 expert testimony is required to be founded upon "facts or data derived from (1) the expert's personal observations, or (2) evidence admitted at the trial, or (3) data relied upon by the expert which is not necessarily admissible in evidence but which is the type of data normally relied upon by experts in forming opinions on the same subject." State v. Townsend, 186 N.J. 473, 494 (2006). Therefore, "an expert's bare conclusions, unsupported by

22

factual evidence, is inadmissible" under the "net opinion" rule.  Buckelew v. Grossbard, 87 N.J. 512, 524 (1981).  The net opinion rule "mandates that experts be able to identify the factual bases for their conclusions, explain their methodology, and demonstrate that both the factual bases and the methodology are reliable."  Funtown Pier Amusements, Inc. v. Biscayne Ice Cream, 477 N.J. Super. 499, 516-17 (App. Div. 2024) (quoting Townsend v. Pierre, 221 N.J. 36, 55 (2015) (internal quotations omitted)).

The net opinion rule does not impose a "standard of perfection." Townsend, 221 N.J. at 54.  Rather, it "is a prohibition against speculative testimony."  Grzanka v. Pfeifer, 301 N.J. Super. 563, 580 (App. Div. 1997).  A judge should not admit expert testimony "if it appears the witness is not in possession of such facts as will enable him to express a reasonably accurate conclusion as distinguished from a mere guess or conjecture."  Vuocolo v. Diamond Shamrock Chems. Co., 240 N.J. Super. 289, 299 (App. Div. 1990). Any purported deficiencies in an expert's opinion may be "a proper 'subject of exploration and cross-examination at trial.'"  Ibid. (quoting Rubanick v. Witco Chem. Corp., 242 N.J. Super. 36, 55 (App. Div. 1990), modified on other grounds, 125 N.J. 421 (1991)).

Regarding Noon's testimony, the court found he provided

expert guidance in the interpretation of the various surveys that have been presented to the [c]ourt. He notes that the Reale, Fralinger and Ewing surveys all agree with each other, and they all agree with the tax map. While he candidly did admit that deeds provide for a metes and bounds description and does advise surveyors, he also provided an opinion that one cannot ignore extrinsic evidence such as the existence of fences.

The record also demonstrates both experts testified concerning the surveys and the historic deeds. Defendants' own expert testified regarding the Reale and Fralinger surveys and addressed their inaccuracies. The court also permitted the parties to present evidence and arguments regarding the reliability and trustworthiness of the surveys, including the circumstances under which they were prepared and any subsequent revisions or withdrawals.

Based on our review of the record, we reject defendants' contention that Noon's testimony was an inadmissible net opinion. Noon simply testified that the tax map, Reale's survey and Ewing's survey were consistent as to the location of the disputed boundary line. He further testified the Stiles deed for defendant's Lot 2 was inaccurate because it "did not close" and that extrinsic evidence should be considered. We conclude Noon's reliance on the challenged surveys to provide his opinion was permitted as the surveys were of the subject property and are the "type of data normally relied upon by experts in forming opinions,"

24

N.J.R.E. 703, in determining boundary lines of a property. Therefore, Noon was permitted to rely upon prior deeds and surveys to form his conclusion that the tax map and the two above noted surveys were identical.

As a licensed surveyor, Noon was permitted to testify to the consistent nature between the surveys and the tax map in order for the trial court's consideration in determining the location of the boundary line. Noon was careful to state that he was not providing an opinion as to the location of the property line and was leaving that decision for the court.

Additionally, we are unconvinced by defendants' contention that Noon's opinion was a net opinion simply because it was based on his reliance on prior surveys and a "drive-by" of the property without "inspecting" it. It is undisputed that the Tax Map of the Township of Maurice River, was prepared by Gordon Ludwig in 1991 and "<u>was revised by Harold Noon in September 1994 (and various other revisions throughout time)</u>" as found by the court. (emphasis added). We determine this fact provides Noon with appropriate and relevant knowledge of the metes and bounds descriptions of the lots in Maurice River Township, including the disputed lots herein, regardless of the fact he did not physically inspect the lots. Here, we conclude defendants' challenge goes to the weight of Noon's testimony, not its admissibility and note that defendants were

afforded cross-examination of Noon at trial to challenge his testimony including the reliability of the documents he relied upon. Based on our above determinations, we conclude the trial court did not abuse its discretion in considering Noon's testimony.

## C.

Under their next point of appeal, defendants contend their expert, Feldman, was a qualified expert who conducted a thorough investigation and provided competent, uncontradicted evidence regarding the boundary, and the court's rejection of his testimony for reasons unrelated to his expertise or credibility was error. Defendants maintain the court's findings were irrational, unsupported by the record, and contrary to the competent evidence presented at trial. We determine these contentions hold merit as related to the court's reasons to completely reject Feldman's testimony.

An abuse of discretion arises when a decision is 'made without a rational explanation, inexplicably departed from established policies, or rested on an impermissible basis.'" Flagg v. Essex Co. Prosecutor, 171 N.J. 561, 571 (2002) (quoting Achacoso-Sanchez v. Immigration & Naturalization Service, 779 F.2d 1260, 1265 (7th Cir. 1985)). An abuse of discretion also arises when "the discretionary act was not premised upon consideration of all relevant factors,

was based upon consideration of irrelevant or inappropriate factors, or amounts to a clear error in judgment." Masone v. Levine, 382 N.J. Super. 181, 193 (App. Div. 2005).

The court determined:

> [I]t must be understood that [DeFabrites] was clearly being harassed by Mrs. Jones, and she also filed a complaint against him with the [B]etter [B]usiness [B]ureau. As if this was not enough to quiet his opinion, counsel for the Thompsons, in open court, requested instructions from the [c]ourt to him about his Fifth Amendment right to not incriminate himself in any criminal wrongdoing. It is unclear why this was done or under what trial strategy, but the [c]ourt finds that it was unnecessary.
>
> What is clear to the [c]ourt is that there were efforts to silence Mr. DeFabrites who held an opinion that the original Reale survey was accurate. Indeed, Ewing, another surveyor, returned the money to Mrs. Jones and advised her that he did not want to get involved and did not want to testify.
>
> It is against this backdrop that the [c]ourt finds it impossible to place any weight on the opinion of Mr. Feldman. This is not to say that the [c]ourt finds he was involved in some type of nefarious plot, but with the efforts made to influence the professionals, it is impossible for this [c]ourt to find that the property markers found by Mr. Feldman exist, are accurate or were not misplaced. The [c]ourt does not find his testimony or opinion to be credible.

27

The trial court's basis for declining to consider Feldman's testimony or the survey he prepared were based on its findings that Geraldine influenced or intimidated other experts/surveyors involved in the case, which the court found made it "impossible to place any weight" on Feldman's opinion or to find that the property markers he identified were "accurate and not misplaced."

Although credibility determinations by the trial court are entitled to our deference on appeal, as the trial judge is best positioned to observe the witnesses and assess their demeanor, we conclude that the trial court misapplied its discretion by not considering Feldman's testimony. The record does not provide an adequate nexus between the inappropriate behaviors of Geraldine perpetrated on other surveyors found by the court, and its finding that Feldman's opinion was not credible in any regard and should not be considered at all.

We further note, our prior remand was based substantially on the court's denial of defendants' request to allow them to present expert testimony at trial. Here, despite our remand, the trial court effectively barred this testimony by not considering it at all. Therefore, we remand to the trial court to consider, evaluate, and enter findings concerning the substance of Feldman's testimony.

Our determination should not be construed as a directive that Feldman's testimony should be accepted by the court, that such testimony is credible or

28

should result in the court finding for defendants. We remand this issue solely because we conclude the court's reasons for not considering and rejecting Feldman's testimony were insufficient as they were not connected to his qualifications as an expert or the sufficiency and relevancy of his testimony. Instead, the court's determination was based upon its finding that Geraldine's unconnected mistreatment of other surveying experts resulted in Feldman's testimony not being credible, essentially excluding his testimony in any respect. On remand, the court shall enter findings concerning whether it accepts any of Feldman's testimony, the weight such testimony should be accorded and his overall credibility. We make no determinations as to the sufficiency or weight Feldman's testimony should be accorded and leave this issue to the sound discretion of the court on remand.

D.

We now turn to defendants' contention that the trial court erred by entering a judgment for adverse possession in favor of plaintiffs. Defendants argue that the court failed to identify specific evidence to justify the "[]tacking" of the plaintiffs' twenty-two years of ownership with their predecessors' possession to meet the required thirty-year period for adverse possession. Defendants argue that there was no credible or sufficient evidence of continuous, uninterrupted,

29

open, and exclusive adverse possession of the disputed parcel by plaintiffs or their predecessors for the required statutory period. Defendants contend the evidence relied upon by the court—such as historic aerial photographs, witness testimony about past parking or bushes, and a recent fence placement was insufficient to satisfy the legal requirements for adverse possession.

Adverse possession is a method of acquiring title through the expiration of statutes of limitation which bar an ejection action and pass title to the property from the record owner to the possessor. Patton v. N. Jersey Dist. Water Supply Comm'n, 93 N.J. 180, 186 (1983); O'Keeffe v. Snyder, 83 N.J. 478, 494 (1980); Stump v. Whibco, 314 N.J. Super. 560, 576 (App. Div. 1998).

Adverse possession is governed by N.J.S.A. § 2A:14-30, which provides:

> Thirty years' actual possession of any real estate excepting woodlands or uncultivated tracts, and [sixty] years' actual possession of woodlands or uncultivated tracts, uninterruptedly continued by occupancy, descent, conveyance or otherwise, shall, in whatever way or manner such possession might have commenced or have been continued, vest a full and complete right and title in every actual possessor or occupier of such real estate, woodlands or uncultivated tracts, and shall be a good and sufficient bar to all claims that may be made or actions commenced by any person whatsoever for the recovery of any such real estate, woodlands or uncultivated tracts.

"Generally, to acquire title by adverse possession, the possession must be actual and exclusive, adverse, visible or notorious, and continued and uninterrupted." Patton, 93 N.J. at 186.

To satisfy the adverse or hostility requirement, a court must find that existence of intent to claim against the owner of the property "in such circumstance of notoriety that the owner will be . . . alerted to resist the acquisition of the right by the claimant." A.J. & J.O. Pilar, Inc. v. Lister Corp., 22 N.J. 75, 81 (1956). Adverse or hostile use requires that the claimant utilize the land without the permission of the owner of the property. Mandia v. Applegate, 310 N.J. Super. 435, 444 (App. Div. 1998). A determination of adverse or hostile use "depends upon the situation and condition of the property and the uses to which the true owner designedly or permissively subjects it." Plaza v. Flak, 7 N.J. 215, 222 (1951). Exclusivity requires "that the users have acted independently of the rights claimed by others, such as the general public. Randolph Town Ctr., L.P. v. Cnty. of Morris, 374 N.J. Super. 448, 454 n.4 (App. Div. 2005).

"As a general rule, successors in title who continue adverse uses may tack the periods of adverse uses of predecessors to establish the statutory period." Stump, 314 N.J. Super. at 567. Our courts "permit tacking, the accumulation of

31

consecutive periods of possession by parties in privity with each other." O'Keeffe, 83 N.J. at 503; Stump, 314 N.J. Super. at 568. "Privity is simply mutual or successive relationship to the same rights of property." Hudson Transit Corp. v. Antonucci, 137 N.J.L. 704, 706 (E. & A. 1948). "[I]n adverse possession claims," the issue is "privity of possession," that is, "[p]rivity between parties in successive possession of real property." Black's Law Dictionary 1320 (9th ed. 2004). The privity "requirement is satisfied if the later user succeeded to the interest of the earlier user by voluntary or involuntary transfer or by succession at death." Restatement, § 2.17 cmt. l.

In its decision, the trial court found:

> In the case at bar, there was no knowing, intentional hostility until after the assertion was made by Jones. The Thompsons believed the disputed area was theirs as set forth in the survey of Reale[]. They have resided in their home since 1999, which is admittedly shy of thirty years. However, the [c]ourt finds that when one []tacks the possessory period of the Thompsons with their predecessor in interest, there has been the requisite period of time to establish adverse possession. This possession has been exclusive, continuous, uninterrupted, visible and notorious, even though under mistaken claim of title. The [c]ourt finds clear and convincing evidence that this is sufficient to establish adverse possession as noted by the Mannillo Court.

Rule 1:7-4 states: [t]he court shall, by an opinion or memorandum decision, either written or oral, find the facts and state its conclusions of law thereon in all actions tried without a jury. . . .

Here, the court found plaintiffs satisfied the legal requirements for adverse possession as the possession was exclusive, continuous, uninterrupted, visible and notorious, and permitted tacking of the prior owners' possession of Lot 1 but failed to provide the specific factual basis in the trial record supporting its legal conclusions. Although we recognize in the portion of its decision concerning the location of the boundary line, the court found the testimony of certain lay witnesses—Dayton, Carrara and Bruckler—to be credible and it considered surveys, deeds and aerial photographs to reach its conclusions as to this issue, we conclude there were no specific findings connecting this testimony and evidence to the portion of its decision related to adverse possession. Therefore, we are constrained to remand this issue to the trial court to enter more specific factual findings and provide its legal conclusions specifically to plaintiffs' adverse possession claim.

To the extent we have not addressed any of defendants' remaining arguments, we conclude those arguments are without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

A-2860-24

We leave to the trial court's discretion whether it should hold supplemental arguments or permit supplemental summations from the parties based on this limited remand concerning the testimony of Feldman and the adverse possession issue.

Affirmed in part, reversed and remanded in part. We do not retain jurisdiction. In the interim, the trial court's judgment and decision remain in force, subject to the remand.

I hereby certify that the foregoing is a true copy of the original on file in my office.

*M.C. Hanley*

Clerk of the Appellate Division

34                                                                    A-2860-24